```
1              IN THE UNITED STATES DISTRICT COURT
            FOR THE EASTERN DISTRICT OF VIRGINIA
2                      Norfolk Division

3

4   - - - - - - - - - - - - - - - - - -
                                      )
5    UNITED STATES OF AMERICA         )
                                      )
6    v.                               )    CRIMINAL ACTION NO.
                                      )       2:22cr108(3)
7    SI LIU,                          )
                                      )
8           Defendant.                )
                                      )
9   - - - - - - - - - - - - - - - - - -

10

11

12                 TRANSCRIPT OF PROCEEDINGS
              (Arraignment and Detention Hearing)

13                   Norfolk, Virginia

14                   August 22, 2022

15

16  BEFORE:  THE HONORABLE LAWRENCE R. LEONARD
              United States Magistrate Judge

17

18

19  APPEARANCES:

20          UNITED STATES ATTORNEY'S OFFICE
            By:  Megan M. Montoya
21               Assistant United States Attorney
                 Counsel for the United States
22
            ZOBY & BROCCOLETTI
23          By:  James O. Broccoletti
                 Counsel for the Defendant
24

25          Cynthia Liu, Interpreter (Via TIPS)
```

1          (Proceedings commenced at 2:53 p.m.)

2          (The interpreter, Cynthia Liu, was duly sworn.)

3          THE CLERK:  United States of America vs. Si Liu,

4     Case 2:22cr108.

5          Are counsel ready to proceed?

6          MS. MONTOYA:  The government is ready to proceed.

7     Good afternoon again, Your Honor.

8          THE COURT:  Good afternoon.

9          MR. BROCCOLETTI:  Good afternoon.  Present and

10    ready, Your Honor.

11         THE COURT:  Good afternoon, Mr. Broccoletti.

12         Good afternoon, Ms. Liu.

13         THE DEFENDANT:  Good afternoon.

14         THE COURT:  This matter is set for a detention

15    hearing and an arraignment, and it's the Court's

16    understanding that Ms. Liu waived her right to an immediate

17    detention hearing, so I presume this comes at your request,

18    Mr. Broccoletti?

19         MR. BROCCOLETTI:  It does, Your Honor.

20         THE COURT:  All right.  Why don't you both have a

21    seat.

22         Ms. Montoya, do you have any witnesses to call, or

23    will you proceed solely by proffer?

24         MS. MONTOYA:  Solely by proffer, Your Honor, thank

25    you.

1          THE COURT:  All right.

2          MS. MONTOYA:  Your Honor, the investigation into Si

3    Liu and her co-conspirators, Mr. Gao and Mr. Wang, began in

4    January 2022, and to date the investigation has revealed that

5    Si Liu worked in the Eastern District of Virginia as an

6    operator or a manager of five illicit massage parlors where

7    employees engaged in commercial sex in both Virginia Beach

8    and in Williamsburg.

9          Now, her role within the conspiracy was to advertise

10   commercial sex appointments online, schedule commercial sex

11   appointments with johns, or customers, collect prostitution

12   proceeds, and encourage women to perform commercial sex acts

13   by providing condoms and financial incentives.

14         MR. BROCCOLETTI:  Judge, could we just ask to slow

15   down a little bit for the interpreter?

16         MS. MONTOYA:  Oh, sorry.

17         THE COURT:  That's a good point, Mr. Broccoletti.

18         Slow down, Ms. Montoya.

19         MS. MONTOYA:  Yes, Your Honor.

20         And so Si Liu is part of a much larger enterprise

21   that is based in Flushing, New York, that also has ties to

22   China, and some of her co-conspirators have been identified

23   to date, some have not.

24         And so two events really got this conspiracy on the

25   radar of law enforcement.  So, first, you had the robbery and

1    the sexual assault of P.T.  And so in January 2022, Virginia

2    Beach Vice and Narcotics detectives interviewed P.T. about

3    two armed robbery incidences she had reported that had

4    occurred at hotels in Virginia Beach.  P.T. admitted that she

5    had been engaged in commercial sex at the hotels and that she

6    was working for a different organization than Si Liu's group.

7         So on October 8, 2021, she reported that she was

8    robbed by two Asian males who she later identified by photo

9    as Gao and Wang.  During that October robbery, she reported

10   that she was strangled to the point of losing consciousness

11   and that she was also pistol-whipped on her head.

12        She did go to the hospital that date, and she had

13   multiple lacerations to her head, and she described pain to

14   her knees and to her legs.  She also stated that she had

15   previously been robbed by the same two men back in June of

16   2021.

17        Putting this in context, nationwide there has been

18   an increased prevalence in violence toward Asian females that

19   are engaged in commercial sex nationwide, so we're seeing

20   cases of women being zip-tied and robbed, and so it appeared

21   to investigators, okay, this violence has now made its way

22   into the Eastern District of Virginia.

23        So law enforcement in January 2022 also received a

24   Crime Solvers tip.  So it's an anonymous tip for a massage

25   parlor that was located on Shell Road in Virginia Beach.  So

1 an officer went out -- or a detective went out and conducted

2 physical surveillance at Shell Road, and what he saw was

3 windows boarded up, which is very consistent with a

4 commercial sex enterprise because people, the

5 co-conspirators, don't want people seeing what's actually

6 going on at the facility.

7 And while conducting physical surveillance, the

8 detective noticed Mr. Gao sitting in his black Lexus.  So he

9 ran Mr. Gao's license plates, and that led to his home

10 address.  The detective conducted additional database

11 searches which showed that Si Liu is married to Yang Gao, and

12 then from there, they began the online investigation.

13 One of the most common websites associated with

14 commercial sex in our area is SkipTheGames.com, and

15 investigators located advertisements for SkipTheGames for a

16 phone number, and that phone number is 757-712-9817.  So

17 those ads -- you had to call that phone number or text that

18 phone number to set up an appointment for commercial sex.

19 So on January 13, 2022, an undercover detective

20 scheduled an appointment for commercial sex and went to the

21 Shell Road spa location where a woman offered commercial sex

22 to the undercover investigator.

23 The investigative team also learned that Si Liu had

24 leased out the Shell Road spa location in the name of another

25 person, so they interviewed the owner and the landlord of the

Shell Road spa who stated that Si Liu had provided an
identification and signed leasing agreements which were
notarized in a different person's name.  They were shown a
picture of her and confirmed that that's who they had been
interacting with and said she had been paying by check each
month and that they had spoken to her and her husband
multiple times over the phone.  They also identified a photo
of Yang Gao as her husband.

During physical surveillance, the investigative team
also observed Si Liu texting on a phone when they were
setting up a commercial appointment for that 9817 phone
number.  As they're texting the 9817 phone number, they
actually see Si Liu pick up a phone and text back, and then
they get a text back from that 9817 phone number.  So she
appeared to be operating and controlling that phone.

They also observed her in physical surveillance pay
the phone bill at a cell phone store for that 9817 phone
number.  They further observed her multiple times throughout
the surveillance going to the massage parlors and
specifically picking up a female from a bus stop and taking
her to the Shell Road spa.

Through physical surveillance, law enforcement
identified Ye Wang as another participant who was assisting
Yang Gao, and so they went back online and went back to
SkipTheGames.com and found more ads for a different spa, the

1    Euclid Road spa, and they believed it to be tied to the same

2    organization because they had very similar, very sexually

3    explicit advertisements.  And so, again, law enforcement

4    conducted an undercover operation at the Euclid Road spa, and

5    again, a female offered to engage in a sex act with the

6    undercover detective.

7          Law enforcement then got a ping for the 9817 phone

8    number, which pinged near Gao and Si Liu's house, and they

9    further observed Gao and Wang travel to Williamsburg and

10   actually meet with someone to start leasing another spa, this

11   time in Williamsburg, the Jamestown Road spa, and at that

12   point, the spa had not even opened, and it was completely

13   empty, and they appeared to be doing a walkthrough, so they

14   conducted additional undercover operations.

15         And then they also investigated the IP address for

16   the prostitution and the massage parlor ads, and so they

17   subpoenaed records from both Verizon and Cox Communication.

18   So there were two IP addresses tied to the ads:  One went

19   back to Si Liu's residence, and one went back to Mr. Wang's

20   residence.

21         So based on everything they had learned, on May 4th,

22   2022, law enforcement executed seven search warrants, so for

23   three residences and for four illicit spa locations.

24         At Si Liu's residence on Brockwell Avenue in

25   Norfolk, she was arrested without incident.  She was found

1    within the residence.  They found financial documents,

2    leasing agreements from multiple of the spa locations, about

3    $57,000 in U.S. currency, some of which was wrapped up and

4    appeared to be broken out in denominations for different

5    employees with names and monikers of the employees working at

6    the spa locations, and multiple cell phones, including they

7    found that cell phone ending in 9817.  And they seized three

8    vehicles from the residence, including a 2019 Toyota Sienna,

9    a 2013 Lexus RX, and a 2018 Subaru WRX.

10           At Mr. Wang's residence in Virginia Beach, the team

11   located banking records, about $32,000 in U.S. currency --

12   again, some of it was wrapped and broken down and appeared to

13   have names of different workers on it -- a money counter, a

14   large shipping box filled with condoms with Mr. Gao's name

15   and address affixed to the shipping label, as well as

16   multiple cell phones, including one phone that went back to

17   the Euclid spa location.  And law enforcement seized a 2019

18   Infinity QX6.

19           And so the third residential location that was

20   searched was Mr. Gao's.  It appeared to be a new address in

21   Virginia Beach, and nothing of significance was located

22   there.

23           So searches were also conducted at massage parlors,

24   and agents recovered condoms, multiple cellular phones, and

25   then interviewed nine women total.  One of the women reported

that the appointments and various services were all accounted for -- everything that they had done was all accounted for on a ledger on WeChat, which is a Chinese instant messaging application.

It's the world's largest standalone mobile app with over 1 billion monthly users. So you can text, you can do voice-messaging and video conferencing, as well as photographs and location sharing from that, and that appears to be how the vast majority of the communications occurred in this case.

And the woman described a profit breakdown was 60 percent of profits going to the bosses and 40 percent going to the women who actually engaged in the commercial sex.

And so the defendants were all interviewed, and they were advised of their *Miranda* rights; and, significantly, Si Liu's husband implicates her in all of this. He admits that he performed various duties at the parlor, including collecting money from the women and giving female employees rides in his vehicle.

He further stated that Si Liu was responsible for setting appointments and managing the posting of appointments for various spa locations on SkipTheGames.com. And so he acknowledged that this was all advertised through SkipTheGames.com. He stated she would perform this duty from

home, which is consistent with what the IP address
investigation showed, and stated she was paid a commission.

Mr. Wang also stated that he performed various
duties at the massage locations, including bringing in
supplies. And Si Liu, relatively soon into questioning,
asked for an attorney, and so she did not make any
significant statement.

And then, finally, is the financial investigation to
date. And so Si Liu and Gao have a joint bank account, joint
deposit account and a savings account at Navy Federal Credit
Union, and then Si Liu also has been individual deposit at
Navy Federal Credit Union and a savings account there, and
Mr. Gao has a Bank of America account.

And so what the investigation on the financial side
has showed is that these bank accounts that I've just
mentioned are all funnel accounts for the conspiracy. So a
funnel account is an account that the sole purpose is to push
money through the account, and it does not have any other
operating purpose, such as paying bills, paying for gas,
buying groceries, nothing like that.

The investigation further revealed that the
defendants routinely deposited proceeds of specified unlawful
activities into the accounts and cash deposits, and that the
defendant sent a portion of the proceeds up to individuals in
Flushing, New York, who are part of the larger enterprise,

and then with the proceeds that they kept, those were
utilized to purchase expensive jewelry, including Si Liu
purchased an Omega watch, diamonds, a gold bar, cars, and
real estate, residential properties.

And so the funnel accounts are fronted by seemingly
random individuals as well as close relatives.  I do have one
exhibit for the Court, Government's Exhibit 1, because it
appears that Ms. Liu's proposed third-party custodian, her
father, is actually engaging in behavior consistent with
money laundering.

And so from this chart, this is a chart of bank
accounts by both Si Liu's parents, and so there are two
different accounts at issue.  So column 1 has the dates of
the transactions.  Column 2 names the financial institutions.
And so the investigative team has obtained records from the
Bank of America account of her parents, but not yet from the
JPMorgan Chase account.

So we don't have those records to see the full
picture yet.  That account was flagged after seeing deposits
from that account going into Si Liu and Lang Gao's bank
accounts.

So what we know from this, starting with the first
three transactions -- from January 19th, 2021; January 20th,
2021; and January 21st, 2021 -- what we see there is her
father went in three days in a row, and he deposited $7,000,

$7,000, and then $6,000 in cash, and he utilized the Brockwell address -- that's her address -- for that account. And so he does these three deposits.

And what's significant about those numbers is that they are all under $10,000. When a person makes a deposit or a withdrawal in excess of $10,000 in cash, that triggers additional banking reporting requirements. That's called a Currency Transaction Report, or a CTR, and so they would have had to fill out additional paperwork.

And so this appears that they are structuring these cash deposits, three in a row, three days in a row, and then on the third day, on the 21st, $20,000 -- just over $20,000 is taken from that account and then sent to the account of Si Liu and Mr. Gao.

So then the second set of transactions is her mother. And so first on the 24th of February, you have her mother depositing $10,000 cash. And that same day, actually all right in the same transaction, also on February 24th, you have the mother immediately getting a cashier's check. Where it says "check sale" under the transaction, "check sale" means cashier's check.

And so she immediately gets a cashier's check, which is then put into a JPMorgan Chase account, which is then put into the Navy Federal joint account of Si Liu and Yang Gao, and so you see that money immediately bouncing through, and

1   that is behavior consistent with money laundering because of

2   the way it is rapidly being funneled through.

3           So then the third set of transactions, in March and

4   July, three by her father, they are all three withdrawals of

5   personal checks in the amount of $5,000, again not triggering

6   that reporting requirement, and all $5,000 withdrawn by

7   personal check to Si Liu and Yang Gao.

8           And so it's possible -- in order to prove money

9   laundering with her parents, we'd have to prove that they

10  knew that the money, the cash that they were handling and

11  depositing, was the proceeds of specified unlawful activity,

12  but I think viewing this evidence -- and this is just a

13  preliminary review of their bank accounts -- viewed in the

14  light most favorable to her parents, they are unwitting --

15  they've been unwittingly duped by her and to be involved in

16  her activities.

17          But it does -- it's exactly consistent with

18  everything we have seen financially to date of money being

19  funneled up very quickly and then money also coming down from

20  New York, including -- from New York and then also there was

21  $100,000 that came to Si Liu from the Bank of China.  And so

22  that would really be for my argument portion, but that is, in

23  part, why the government is opposed to her father serving as

24  a third-party custodian.

25          THE COURT:  Ms. Montoya, do you have -- this

1    Exhibit 1 that you've provided to the Court all shows money

2    going from the Bank of America and the JPMorgan Chase

3    accounts to defendants Liu and/or Gao.  Do you have any

4    showing money going the other way?

5            MS. MONTOYA:  Money going to the parents

6    specifically?  If I could confer with the agent, Your Honor,

7    one moment.

8            THE COURT:  All right.

9            MS. MONTOYA:  We do not, Your Honor, no.

10           THE COURT:  All right.  Thank you.

11           I guess you're done, Ms. Montoya, I assume?  You're

12    sitting down.

13           MS. MONTOYA:  What was that?

14           THE COURT:  You've completed your proffer?

15           MS. MONTOYA:  Yes, sir.  I apologize.  That was the

16    extent of my proffer, yes.

17           THE COURT:  All right.  Mr. Broccoletti?

18           MR. BROCCOLETTI:  Your Honor, obviously we're at a

19    significant disadvantage in a couple of reasons:  Number one,

20    we have no discovery, so I can't comment on the strength or

21    the weakness of the evidence; number two, with respect to

22    Government's Exhibit 1, it was given to me about 2:20.  Her

23    mother and father are present.  They speak no English.  I

24    have no interpreter, so I am not in a position at all to ask

25    them any questions with respect to this, so it puts us in a

1    disadvantage to try and comment on that.

2            So I would -- I think I follow the Court's lead,

3    though, and the question that the Court asked is that we have

4    no context to Government's Exhibit 1.  We show amounts being

5    deposited by the father back in 2021 in three separate

6    occasions.  We have no sense at all as to where those funds

7    came from.  We have no sense at all as to what the balance of

8    the account may have been prior to the time of those

9    deposits.

10           This exhibit seems to infer that the check sale of

11   $20,000 was directly related and only related to the three

12   deposits of 7-, 7-, and $6,000; but without the context of

13   what the balance of the account was prior to that, we really

14   can't say one way or another as to what effect these may

15   have.

16           And likewise, in terms of the 2022 and the 2020

17   accounts, I would note that these are three separate events,

18   if you will, over the span of two years, so the Court can

19   give it such weight as the Court deems to be appropriate.

20           With respect to the proffer, we would submit to the

21   Court that based upon the two Pretrial Services reports that

22   have been done, we have a stable home for Ms. Liu to go to.

23   We have her mother and her father that have traveled here

24   from Queens that are living here now taking care of her son.

25   Her son is enrolled in school.  The government has seized her

1    passport at the time that she was arrested.

2         I think what's notable and what's significant is

3    that the Court has detained the other two gentlemen as a

4    result of the violent offenses of robbery that are alleged

5    against them.  There was nothing in the government's proffer

6    with respect to Ms. Liu that she was involved in any of those

7    activities whatsoever.

8         So I think there's a significant separation or

9    distinction that we can draw between her conduct, again, just

10   as what's alleged, and the conduct of what's been charged in

11   the indictment with respect to the other two co-defendants,

12   and so I think that's significant to the Court in the Court's

13   ultimate determination.

14        But other than that, I would just rely upon the

15   information that's contained within both of the Pretrial

16   Services reports.

17             THE COURT:  All right.  Thank you.

18             MR. BROCCOLETTI:  And I would have an argument at a

19   later point.

20             THE COURT:  All right.  Very well.

21             All right.  Ms. Montoya, I'll hear your argument.

22             MS. MONTOYA:  Your Honor, it's the government's

23   position that there are no conditions that could be fashioned

24   to ensure the safety of the community and to ensure the

25   defendant's future reappearance.  This is a very serious

1    offense/offenses.

2         And turning to the nature and circumstances, these

3    are crimes of sexual exploitation of multiple women as well

4    as money laundering of substantial criminal proceeds.

5         THE COURT:  Are any of these spas still open?

6         MS. MONTOYA:  No, Your Honor.

7         THE COURT:  All right.

8         MS. MONTOYA:  And these defendants are just pieces

9    of a larger enterprise, all based out of New York.  It is

10   very troubling, the level of violence utilized by her

11   co-defendants.  I have no evidence to date that she had

12   knowledge of the robbery, but that is who she's associated

13   with; very violent individuals.

14        The evidence against the defendant is overwhelming.

15   She is linked to that operator number ending in 9817 which is

16   linked to the Shell Road spa.  That's the number listed in

17   commercial sex ads.  That's the number she's observed

18   physically texting on during surveillance, and she's also

19   observed paying for that phone bill.

20        And that phone was found in her residence at the

21   time of the search warrants' executions.  And she also took

22   out that Shell Road spa lease in another person's name, using

23   photo identification for that person, and the landlord stated

24   she went by a different name.  So -- as well as the IP

25   addresses for multiple commercial sex ads all linking to her

1    residence.

2         And then her husband puts her right in the middle of

3    the conspiracy.  He said -- and it's consistent with

4    everything we've learned to date in the investigation -- that

5    she was advertising and responding to the ads and running as

6    an operator the commercial sex dates.

7         And not only do we have the bank records of Si Liu,

8    we also have her on video engaged in money laundering.  We

9    have at least six different videos of her engaging in the

10   banking transactions, making numerous cash deposits and then

11   withdrawals, all of which that money appears to have been

12   funneled into buying residential properties.  So I submit

13   that the evidence in this case is very strong against this

14   particular defendant.

15        In terms of her ties to the area, her husband is her

16   co-conspirator.  Her parents appear to be making cash

17   deposits at the same time that this conspiracy is earning

18   cash from commercial sex.  And then the banking records also

19   are inconsistent with what she said and her husband said

20   about what they're doing.

21        So she claimed she was a homemaker, which is

22   inconsistent somewhat with the physical surveillance which

23   showed her going to these spas on different dates.  And her

24   husband stated he was an independent construction worker, and

25   during the surveillance, he was never seen doing any kind of

construction work on anything except his own properties.

And so we have, from the bank records, hundreds of thousands of dollars moving through their accounts, including -- it was -- $130,000 was the exact amount that came in from the Bank of China, and so this is someone with substantial assets as well as that false identification.

Mr. Broccoletti is absolutely right; we did seize her U.S. passport, but she is somebody who has demonstrated an ability to acquire false identification, and so I submit there's nothing stopping her. And she certainly has the means, and she has uncharged co-conspirators who have substantial financial assets should she choose to flee.

And so at best, again, I think the third-party custodian may have been duped into making cash deposits, but that would not be an appropriate third-party custodian, someone that she's been able to trick into being involved in her criminal activity.

And then sending her to Flushing, New York, is right where this -- that's where this enterprise is based. So that would be sending her right into the heart of the conspiracy. And so for all those reasons, I'd ask that the Court detain this defendant. Thank you.

THE COURT: All right. Thank you, Ms. Montoya.

Mr. Broccoletti?

MR. BROCCOLETTI: Judge, nobody is suggesting that

1    she be allowed to go to New York or to Flushing.  I think the

2    plan that we've submitted to the Court is that she remain

3    here in Norfolk at the Brockwell Avenue address.  Her parents

4    have moved here from Queens to be here for her, to support

5    her, to take care of her child, so there's no hint whatsoever

6    of having her leave that particular location.  No one's

7    suggesting that she be allowed to go to Flushing.

8            With respect to the issues before the Court today,

9    it's not to determine if she's guilty or not guilty.  That's

10   to be decided at a later point.  What we're here to decide

11   today is, number one, is she a risk of flight; and, number

12   two, is she a danger to the community.

13           With respect to danger to the community, she has no

14   prior criminal record.  She has no substance abuse issues.

15   She has no mental health issues.  There's no evidence of her

16   being involved with a firearm or violence or any explosive

17   devices or any crimes of that nature which would give the

18   Court concern about her being a danger.

19           Her husband is in custody.  And the reason I mention

20   that is because the allegations are that she is involved in a

21   conspiracy with her husband and with this other gentleman.

22   If her husband is in custody, as is the other gentleman, and

23   they will remain in custody throughout the duration of this

24   pretrial period, that the danger to the community, I'd

25   suggest to the Court, has been diminished greatly because of

1  her inability to communicate with her husband and to

2  associate with her husband.

3        With respect to risk of flight, there are terms and

4  conditions that the Court can impose.  The Court can easily

5  impose a home electronic monitoring device.  The Court can

6  prohibit her from being involved in the use of any electronic

7  media or devices.  She doesn't need to be on a laptop.  She

8  doesn't need to be on a desktop.  She doesn't need to be

9  involved with any sort of electronic devices.  And Probation

10 can monitor that.

11       The Court can certainly restrict her to the home and

12 the care of her child.

13       And I would point out to the Court what I think is

14 very significant:  This trial is seven months away.  She's

15 been in custody now already since May of this year, initially

16 on state charges.  She went into federal custody in July.

17 But we're not talking about a trial date until March the

18 28th, which is a significant, significant period of time and

19 a very onerous burden upon her.

20       So we think that under the facts that we've

21 submitted with respect to the passport being surrendered, or

22 it's been seized, there's an ability of the Court to restrict

23 her to the home.  There's the ability of the Court to

24 restrict her to be with her son.  There's an ability of the

25 Court to restrict her to only be with her family and for

1    Probation to monitor her with respect to any electronic

2    devices if there is a suitable plan that could be in place.

3              THE COURT:  All right.  Thank you, Mr. Broccoletti.

4              Well, the Court looks at every case individually

5    with respect to each defendant under the factors of The Bail

6    Reform Act.

7              So starting with the first factor, the nature and

8    circumstances of the offense, the defendant has been charged

9    with three offenses, not four.  They are the use of

10   facilities in interstate commerce to promote prostitution,

11   conspiracy to commit money laundering, and general

12   conspiracy.

13             Now, these charges are quite serious.  They involve

14   the alleged sexual exploitation of women who have been

15   required -- or at least who are working, allegedly, in

16   massage parlors that engage in commercial sex acts.  So these

17   are serious charges, and I believe they carry with them

18   substantial penalties, including the money laundering charge.

19             Now, the weight of the evidence is quite strong to

20   tie this defendant to the unlawful activities, specifically

21   tying her to the activities that are alleged to have gone on

22   in the spas.  Between her phone number and some of her bank

23   records, it appears that the government does have substantial

24   evidence.

25             With respect to the defendant's personal history and

1 characteristics, the defendant was born overseas in China,

2 but she, I believe, is now an American citizen.  She has

3 married, has a three-year-old child and, therefore, has

4 developed ties to this community through her residence here

5 and through her starting of a family here.

6      Though the defendant has surrendered her passport,

7 there's no information about whether or not she has still

8 kept a foreign passport, which may be a bit of a concern.

9      The defendant has proposed her parents to be

10 third-party custodians, and these are folks who have traveled

11 down here from Queens, New York, have agreed to reside with

12 the defendant at her residence to help act as third-party

13 custodians and to keep watch, care for the three-year-old

14 child, which is a demonstration of very strong family ties.

15 Both of her parents are permanent residents of the

16 United States.

17      The defendant has no criminal record, no substance

18 abuse history, no mental health issues and, otherwise, does

19 not have any of the individual factors under personal history

20 and characteristics that would cause the Court to give real

21 pause to the question of bond.

22      The last factor is the nature or the risk of danger

23 posed to any other person in the community by the defendant's

24 release.  And although the defendant is married to another

25 defendant who is alleged to have committed interference with

1    commerce by robbery, although I judge every case

2    individually, I was the judge who presided over the detention

3    hearings for the co-defendants, and I recall being

4    specifically concerned about the violent conduct that was

5    alleged to have been committed against this one particular

6    individual with the initials P.T., and the risk posed to her

7    in particular and any other potential witnesses posed by the

8    defendant's release.  That was an important factor for the

9    Court's consideration.

10        But notably, the defendant has not been tied to that

11   conduct, and I think the government conceded that they have

12   no information that she was aware of that conduct.  So I

13   don't believe that the defendant poses a risk of danger to

14   the community that couldn't be mediated or mitigated by

15   certain conditions.

16        So the predominant concern the Court has is the

17   defendant's risk of nonappearance, and if the defendant

18   didn't have such strong ties to China, that wouldn't be much

19   of a concern at all, but she has such ties, and the

20   government has proffered that the Bank of China is making

21   deposits into bank accounts here that find their way to the

22   defendant.

23        So while that is a concern, I'm not going to assume

24   that I can't impose conditions sufficient to mitigate that

25   concern and to overcome the notion that the defendant is an

1    unnecessary risk of flight.  I think there are conditions

2    that I can impose, and they are going to be significant

3    conditions because there is that potential.

4           So what I'm going to do is order the defendant's

5    release on a $20,000 unsecured bond.  I'm going to appoint

6    her parents as third-party custodians jointly, and I'm going

7    to require the parents to sign off on that bond as well.  I'm

8    going to release the defendant to the custody of her parents

9    at that Brockwell Avenue address, and the defendant will be

10   subject to home electronic monitoring.

11          Mr. Broccoletti has suggested that potentially

12   depriving the defendant access to electronic devices could

13   help, but I think that's probably unworkable in this day and

14   age, especially in light of the fact that her parents are

15   going to be living with her, and the Court is not inclined to

16   deprive them of access.

17          So I'm not going to impose that condition, but I

18   will impose a condition that defendant will be subject to

19   home electronic monitoring and home detention.  And she is

20   not to have communication, either directly or indirectly,

21   with either of her co-defendants.

22          To the extent that the defendant Mr. Gao needs to be

23   in communication with his son, that's a separate matter, and

24   that's subject to his conditions of release -- excuse me --

25   to his -- the fact that he's detained.  So Ms. Liu is not to

1    talk with her husband.

2         But I'm not sure, Mr. Broccoletti, is it feasible to

3    prevent any communication at all or just communication about

4    the case?

5         MR. BROCCOLETTI:  Judge, I think that you can

6    prevent any communication.  I think he can call the home and

7    speak to the mother or the father who could then have access

8    to the child to communicate in that way.  There would be no

9    reason for them to be able to discuss individually if any

10   communication had to occur about the child's welfare,

11   education, things of that nature.

12        THE INTERPRETER:  Sorry for the interruption, Your

13   Honor.  The interpreter can barely hear counsel.

14        MR. BROCCOLETTI:  I'm sorry.  My fault.  I

15   apologize.

16        THE COURT:  And you probably want to slow down, too.

17        MR. BROCCOLETTI:  Yes, sir.

18        Your Honor, I do think that you can eliminate any

19   communication between husband and wife.  Any communication

20   that would need to occur about the child could occur through

21   the auspices of the mother and the father.  They would be at

22   the home.  They obviously speak Chinese.  They would be in a

23   position to then communicate with the father -- with the

24   husband, rather, about any health, welfare, educational

25   issues that need to be discussed.

THE COURT:  All right.  I think that would be appropriate, and that sounds much more workable.  So if her co-defendant and her husband wish to communicate or have information of the well-being of the three-year-old, then he can do so through the defendant's parents.

These conditions have to be put in place before the defendant will be released, but our probation officers are very efficient at setting that up promptly, so that will happen in the next day or two.

And then, Ms. Liu, you'll be placed on this unsecured bond.  Now, it's going to be up to you to make sure you adhere to all of these conditions, because if you don't, the Court will learn of it, and then it will have to reconsider its decision.

All right.  Can we go forward with an arraignment now?

MR. BROCCOLETTI:  Yes, sir.

MS. MONTOYA:  Your Honor, just at this time I'd ask for a brief stay of the release order.

THE COURT:  Well, I'll tell you what, Ms. Montoya, it's going to take a day or two to get the electronic monitoring put into place.

It's not often that the government asks the Court for a stay, but the last time it happened, the AUSA involved had certain information that he hadn't offered to the Court

1   at the detention hearing, and that information was

2   significant.

3          Is there information that you are going to offer to

4   the district judge that you haven't offered to this Court?

5          MS. MONTOYA:  No, sir.  Same information, yes, sir.

6          THE COURT:  Well, Ms. Montoya, I will give you 48

7   hours to get an appeal up to the district judge.  That's

8   Judge Allen.  That's right.

9          MS. MONTOYA:  Yes, sir.

10         THE COURT:  And I will stay my order as long as you

11  file that appeal promptly.  I will also notify Judge Allen

12  that she has an appeal coming her way, so she can attend to

13  it promptly.

14         She may very well require the transcript of this

15  proceeding, and then she will take it from there.  But in ten

16  years, there's only been a small handful of times the

17  government has asked me to stay an order, so I'll grant you

18  that motion this time.

19         MS. MONTOYA:  Thank you, Your Honor.

20         THE COURT:  All right.  Let's proceed with

21  arraignment.

22         Mr. Broccoletti, have you been provided a copy of

23  the indictment?

24         MR. BROCCOLETTI:  I have, Your Honor.

25         THE COURT:  Have you reviewed the charges in the

```
 1    indictment with your client, and does she understand the
 2    charges?
 3              MR. BROCCOLETTI:  I have, and she does.
 4              THE COURT:  Does she wish the Court to read the
 5    indictment to her, or will she waive formal arraignment?
 6              MR. BROCCOLETTI:  She will waive.
 7              THE COURT:  Will she plead not guilty and ask for a
 8    trial by jury?
 9              MR. BROCCOLETTI:  She will.
10              THE COURT:  Does she wish to attend pretrial motion
11    hearings?
12              MR. BROCCOLETTI:  She does.
13              THE COURT:  All right.  Since you were in the
14    courtroom, you understand that the trial date in this case
15    has so far been set for March 28th of 2023, and you mentioned
16    it yourself.  That delayed trial setting was based on the
17    complexity of the case, and you heard the government's
18    grounds for the motion.  Do you have any objection to that
19    setting?
20              MR. BROCCOLETTI:  I do not.
21              THE COURT:  All right.  Ms. Liu, is your name Si
22    Liu?
23              THE DEFENDANT:  Yes.
24              THE COURT:  How old are you, ma'am?
25              THE DEFENDANT:  35.
```

1          THE COURT:  How far did you go in school?

2          THE DEFENDANT:  College.

3          THE COURT:  Do you presently have a drug or alcohol

4    addiction?

5          THE DEFENDANT:  No.

6          THE COURT:  Are you under the influence of alcohol

7    or drugs now?

8          THE DEFENDANT:  No.

9          THE COURT:  Are you presently receiving psychiatric

10   care?

11         THE DEFENDANT:  No.

12         THE COURT:  Have you been provided a copy of the

13   indictment in this case?

14         THE DEFENDANT:  Yes.

15         THE COURT:  Have you reviewed the charges in the

16   indictment with your lawyer, and do you understand the

17   charges?

18         THE DEFENDANT:  Yes, I do.

19         THE COURT:  When I ask you for your plea, do you

20   want me to read the entire indictment to you, or will you

21   waive formal arraignment?

22         THE DEFENDANT:  I will waive.

23         THE COURT:  Ms. Liu, you've been charged by

24   indictment with one count of conspiracy, one count of use of

25   facilities in interstate commerce to promote prostitution,

one count of conspiracy to commit money laundering, and one

count -- excuse me, and that's all.  There's also a criminal

forfeiture allegation.

          To those charges, how do you plead; guilty or not

guilty?

          THE DEFENDANT:  Not guilty.

          THE COURT:  Do you wish to have a trial by jury or

by the Court?

          THE DEFENDANT:  Jury.

          THE COURT:  Do you wish to be present for pretrial

motions?

          THE DEFENDANT:  I don't think I understand that.

          THE COURT:  All right.  Oftentimes during the

process of pretrial activity, usually the defense may file

motions directed towards the evidence or any particular trial

issue.  Those motions are held in open court, and you have a

right to attend those hearings.

          I'm asking you if you want to assert that right and

attend all hearings before trial?

          THE DEFENDANT:  Yes.

          THE COURT:  All right.  This case is being set for

trial to begin March 28th, 2023, at 10:00 a.m. in Norfolk

before Judge Allen.  The Court has previously found that the

ends of justice outweigh the interests of the defendant and

the public in a speedy trial because of the complexity of

1  this case, and both the government and the Court have stated
2  the reasons advanced by the government for setting this case
3  as late as March.

4          Do you have any objection to that finding?

5          THE DEFENDANT:  Ah, no.

6          THE COURT:  All right.  So the case will be set as
7  indicated.  The motion cutoff date is eight weeks from today.

8          Ms. Montoya, Mr. Broccoletti, any further matters
9  for the Court to address?

10          MS. MONTOYA:  Nothing further from the government.
11  Thank you, Your Honor.

12          MR. BROCCOLETTI:  No, sir.  Thank you.

13          THE COURT:  All right.  Thank you, counsel.

14          Thank you, Ms. Liu.

15          And thank you, Ms. Liu, for translating.

16          THE INTERPRETER:  Thank you, Your Honor.

17          (Proceedings adjourned at 3:39 p.m.)

18

19

20

21

22

23

24

25

```
 1

 2                        CERTIFICATION

 3

 4          I certify that the foregoing is a correct

 5    transcript, to the best of my ability, of the court's audio

 6    recording of proceedings in the above-entitled matter.

 7

 8              _____/s/_____

 9                      Carol L. Naughton

10                      August 29, 2022

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```